[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action for dissolution of marriage was commenced in the Waterbury Judicial District. It was referred to the Regional Family Trial Docket for a fully contested trial. Both parties were represented by counsel. The interests of the children were protected by a Guardian Ad Litem, Attorney Margaret C. Hollon, throughout the trial. Trial began on July CT Page 2015 23, 2001. The trial progressed for 6 days until August 3, 2001. After testimony was concluded on that day the court, on its own motion, ordered the parties and their children to undergo psychological testing by Sidney Horowitz, Ph.D. Subsequently, the court appointed an attorney for the minor children, Attorney Barry F. Armata, who participated together with the Guardian Ad Litem. Once the psychological testing was completed, the trial resumed on December 13, 2001 and again on January 2, 2002 for an additional 6 days. During the course of the trial numerous witnesses testified and a massive amount of documentary evidence was introduced. The parties presented evidence on child custody and access, child support, alimony, division of assets and liabilities, health insurance, life insurance, and counsel fees. The court has considered all of the statutory criteria for the orders to be issued. The statutory criteria will not be restated here.
The parties were married on July 30, 1985 in Waterbury, Connecticut. There are three minor children of the marriage: Jeremy Schain, born February 12, 1989, Jennifer Schain, born March 14, 1991, and Daniel Schain, born August 6, 1994. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of public assistance during the period of the marriage.
This case presents two stubborn, uncompromising, embittered parents who engaged in a long, costly, acrimonious struggle over every conceivable issue in this case. Despite the dogged efforts of the Guardian Ad Litem and the attorney for the minor children to encourage the parties to resolve at least some of their differences, the parties proceeded to fight to the end, at great expense to the financial and emotional well-being of their children.
The plaintiff father, Norman Schain, is 41 years old. He is in good health. He has a bachelor's degree in accounting from Bentley College and became a certified public accountant in 1983. He worked for a CPA firm for five years, and then Otis Elevator for six years before joining his current employer, Health Net, a managed care company. He has gross weekly wages of $1,394. He also does income tax preparation from his home. Many of his clients are family and friends. Some of them do not receive a bill from the plaintiff but make a cash gift to him in lieu of a fee. These regularly recurring gifts or tips must be included in his gross income in the calculation of child support. Guidelines, Section 46b-215a-1
(11) (A) (iii) and (xviii). The plaintiff has failed to include these regularly recurring gifts or tips on his financial affidavit. On the other hand, the defendant has included these gifts in the plaintiff's income shown on her child support worksheet, but she has failed to deduct the plaintiff's reasonable and necessary business expenses from his gross income. Guidelines, Section 46b-215-1 (11) (A) (xvi). As a result of the CT Page 2016 parties failing to agree on these two simple Guidelines issues, the court has been forced to calculate the proper figure to use for the plaintiff's weekly self-employment earnings. This small item is representative of the entire case. Neither side was willing to concede even the most obvious points. The result has been a colossal waste of attorney's fees and judicial time. Having reviewed all of the evidence on this issue, the court accepts the defendant's gross figure of $314 per week for the plaintiff's self-employment income. The court also accepts the plaintiff's figure of $69 per week for his reasonable and necessary business expenses. Therefore, the plaintiff's weekly self-employment income is found to be $245.
The defendant wife, Judith Schain, is 43 years old. She is in good general health. She takes medication for an emotional condition which does not limit her employment. She has a bachelor's degree from UCONN and a masters degree from Southern Connecticut in speech pathology. Since 1985 she has worked as a speech pathologist for the State of Connecticut working 21 hours per week. Her present position would not entitle her to work additional hours. She has gross weekly earnings of $707 per week. The parties disagreed sharply over the defendant's proper tax withholding. Unfortunately, no evidence was presented to enable the court to make a proper determination.
The causes of the breakdown of the marriage are complex. The parties disagreed over many issues involving their own relationship as well as the proper way to raise children. Arguments were frequent, sometimes loud and angry. There is an extraordinary exchange of letters between the parties in which they both set out their feelings and objections about each other. These letters reveal a couple which has no interest in listening to the legitimate grievances of the other. Despite the mountain of evidence, the court is unable to say whether one of the parents is more at fault for the breakdown. It appears that both parents contributed in equal measure.
The parties are at odds over the issue of legal custody. The plaintiff seeks joint legal custody of the children, while the defendant seeks sole Legal custody. The Family Relations Counselor, Michael B. Elder, supported the defendant's position. The Guardian Ad Litem, the attorney for the minor children, and the psychological evaluator all recommended that the parties share joint custody, with the defendant mother being given the power to make final decisions if the parties are unable to agree following consultation.
Section 46b-56 (b) of the General Statutes governs the issue of custody:
In making or modifying any order with respect to custody or CT Page 2017 visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference.
The following quotation from the case of Raymond v. Raymond,165 Conn. 735, 741 (1974) sets forth the rule of law on the issue of custody:
Where custody and visitation rights have been affected, a court has the power and the duty to safeguard those fights while recognizing that such interests are subordinate to the welfare of the children. Neither parent's interests with regard to his or her children are a property right nor are they fights which cannot be terminated without his or her consent. A contest relative to custody, such as visitation rights, is notone primarily to determine the rights of the respective parties butrather a determination of the best interests of the child or children. (Citations omitted) [Emphasis added]
Both parties presented this case as if it were about their own parental fights rather that the best interests of the children. Although both parents love and want what is best for their children, they are so consumed with hatred for each other that neither party is willing to take the next step: to put aside his or her own hurts and bitterness for the good of the children. The children's lives have been marked by severe parental conflict. They have witnessed their parents hatred for one another on numerous occasions. Both parties have disparaged the other to the children. This has impeded the children's ability to have a loving, stable relationship with both parents, especially their father. It is the reluctant conclusion of the court that the parties have unwittingly harmed the children and will continue to do so unless the hostilities can be decreased. While it is important that both parents have input into the major decisions affecting the upbringing of these children, joint legal custody without a right of final decision making will simply allow the parties to continue the hostilities endlessly while important decisions go unmade. One example of this endless inability to agree about important issues relates to Jeremy's upcoming Bar Mitzvah. This significant event is supposed to happen in the next few months. But, as of the last day of trial the parties were still at odds over important aspects of the service. As a result, Jeremy was feeling very stressed. It is clear that one party must have the right to make final decisions on this and other fundamental parental issues if the parties are unable to reach agreement after consultation.
The defendant mother is better suited to be the final decision maker. The evidence overwhelmingly shows that throughout the turmoil of this case the plaintiff father has had very little basic common sense when CT Page 2018 making parental decisions. Time and again the plaintiff made the wrong decision when confronted with a simple choice during the course of this litigation. First, he chose to try to forcibly remove a rocking chair from the defendant's room while the children watched. This resulted in him being arrested, ordered to leave the family home pursuant to a criminal protective order, subjected to a civil restraining order, and forced to have only supervised visitation with the children. Next, he chose to disregard the advise of the family relations counselor not to leave a Valentine's card and flowers for his daughter at a neighbor's house at a time when the restraining order was in effect and he was to have no contact with his children other than supervised visitation. Next, he violated the terms of an agreement to allow him to attend his son's school play. Instead of staying out of sight in the back row as agreed, he moved up to a more conspicuous seat and allowed the children to see him. Next, he again disregarded the advise of the family relations counselor by allowing his daughter to sleep in his bed on the first night that the children were permitted to visit him in his new apartment. Next, he allowed the children to look at a court document regarding visitation after he had agreed not to involve the children in the litigation. Next, he initially sought to divide the children by seeking custody of the two boys but not his daughter; fortunately, he then abandoned this bad idea. Next, he insisted on giving the alimony check to the children to hand to their mother despite being repeatedly requested not to do so by the defendant. Next, he failed to read a note from the defendant about soccer sign ups for Daniel with the result that Daniel was not able to play. Next, despite the plaintiff's expressed support for the children's religious training, he has not paid for their synagogue dues or religious school expenses for 2001, thereby endangering their education. The defendant has been forced to attempt to pay these expenses. Finally, he subpoenaed his daughter's psychiatrist to the hearing with the intent of having him testify. Fortunately, he was persuaded to abandon this idea. The plaintiff sought to characterize these bad decisions as not serious. But, they are more than sufficient to demonstrate that the plaintiff simply lacks basic common sense. The defendant mother has exercised poor judgment at times as well. In particular, her hostile, disrespectful treatment of the plaintiff father in front of the children is shameful. Also, she exercised poor judgment in bringing her daughter to the police for "a good talking to" without consulting the plaintiff. As a result, the daughter was arrested. But, there was less evidence of a continuous pattern of poor judgment by the defendant on such a variety of topics as that exhibited by the plaintiff
The financial affairs of the parties have been damaged by this litigation. The plaintiff warned the defendant and the defendant's brother-in-law, David Ruth, that he would drag the case out as long as he could until there was nothing left. Undoubtedly these statements must be CT Page 2019 discounted because they were made in anger. But, unfortunately, they have almost come true. The parties have spent about $300,000 in litigation expenses. The court makes the following findings regarding financial issues:
1. There is a marital home in joint names at 160 Patriot Road, Southbury, Connecticut, with a value of $435,000. There is a first mortgage with a principal balance of $255,499. The defendant wife has a lien from her attorney on her interest in the approximate amount of $65,766.
2. There are stocks, bonds, and mutual funds with a value of $142,899. $87,759 of this amount, including growth, originated in gifts from the plaintiff's family and are in the plaintiff's name. $29,557 is in the defendant's name, and the balance is in joint names.
3. There is a 1992 Honda Accord driven by the plaintiff with a value of $4,000. There is a 1998 Plymouth Voyager driven by the defendant with a value of $13,550.
4. The are savings, checking, and credit union accounts with a total balance of approximately $5,000.
5. There are household furnishings and personal property of uncertain value. There is a piano in the marital home which is only played by the plaintiff
6. The plaintiff has deferred compensation plans with a present value of $158,782. The defendant has deferred compensation plans with a present value of $101,659. The plaintiff has a pension with a present value of $13,500. The defendant has a pension with a present value of $25,555.
7. The parties have custodial accounts for the benefit of their children with a present value of $176,604. The children are also the beneficiaries of two trusts created and funded by the plaintiff's family with a total present value of $253,567.
8. The plaintiff has $500,000 of group term life insurance which costs $5 per week.
9. The plaintiff was not candid about all of his financial dealings during the pendency of this case. As a result, on cross examination he was, time and again, confronted with documentary evidence which revealed his lack of forthrightness.
10. The plaintiff disregarded the automatic orders in January 2000 by CT Page 2020 withdrawing funds from joint accounts without the defendant's consent. He tried to justify his actions by pointing out that he put the funds into another joint account. But, it was only after having the documents placed in front of him, that was he forced to concede that within a few days he removed the funds from the second joint account and deposited them in a sole account.
11. The plaintiff disregarded the automatic orders in April 2000 by selling jointly held stocks without the defendant's consent. He tried to justify his actions by saying that he needed the money to pay ordinary bills. Documentary evidence clearly shows that the plaintiff had over $100,000 in accounts in his own name with which to pay bills. Even after having these documents shown to him the plaintiff was unwilling or unable to appreciate the impropriety of his actions.
12. In May 2000 the plaintiff again disregarded the automatic orders and sold jointly held securities without permission. This time he used the money to pay his alimony. Incredibly, he claimed that he was permitted to do this under the automatic orders because the payment of alimony constituted the expenditure of funds in "the usual course of business."
13. On August 7, 2000 the plaintiff was instructed by the court (West, J.) not to use jointly held funds to pay his alimony. In August 2000 he again sold a jointly held security without the defendant's permission, endorsed the check made out to both parties and put the funds into an individual account and used the funds, in part, to pay alimony. The plaintiff had sufficient assets in his own name to pay his alimony, something which the court had said he could do. But, the plaintiff was attempting to avoid spending any of his individually-titled assets because he was attempting to claim that these assets came from gifts to him individually from his family and were not marital assets, a position which he retracted late in the trial.
14. In November 2000 the plaintiff became upset when he found out that the defendant was attempting to sell a joint asset in order to pay her attorney. Unlike her husband, the defendant had no individually held assets to use for attorneys fees. The plaintiff was able to stop the sale by the defendant and was then able to put the funds into his own name for "safekeeping". The hypocrisy of this action is obvious.
15. During the pendency of this case the plaintiff withdrew $102,188.34 from marital assets while the defendant withdrew $56,921.88. It is fair and equitable that the defendant be reimbursed one half of the difference between these figures, i.e., $22,633. CT Page 2021
16. On July 21, 2000 the plaintiff unilaterally reduced his child support payments by $63 per week. He did this because, by his reasoning, he did not have to pay his child care contribution of $63 per week in the summer when the children attended summer camp rather then day care. Regardless of whether this position makes any sense, he never received court approval. Furthermore, he never restored the $63 to his weekly payments when the children went back to school in September and began using day care again. The plaintiff owes for day care for the period from July 21, 2000 to the January 4, 2002 at $63 per week for a total of $4,788.
17. In January 2000 the parties agreed that the plaintiff would move out of the master bedroom and into one of the children's rooms. On January 18, 2000 the parties agreed, and the court ordered, that the plaintiff would buy the new beds for himself and the children. The defendant actually bought the beds at a cost of $1,688. The plaintiff has never reimbursed the defendant.
18. The plaintiff's continuous efforts to withdraw joint funds in violation of the automatic orders have resulted in substantial attorney's fees by the defendant in attempting to stop him. It is fair and equitable that the plaintiff pay $15,000 to the defendant toward these fees.
19. In light of all of the statutory criteria and the credible evidence it is fair and equitable that the parties divide the real estate and securities as follows: 60% to the defendant and 40% to the plaintiff. The house has equity of $179,501 and the securities are valued at $142,943. Therefore, the defendant will receive $193,466 of the total of $322,444. In addition, she must receive the sums set forth in paragraphs 15, 16, 17, and 18 above.
19. It is fair and equitable that the parties retain their pensions but that other retirement assets be divided equally.
20. There have been substantial fees resulting from the work of the Guardian Ad Litem, the attorney for the minor children, and the psychological evaluator. Partial payments have been made by the parties. It is fair and equitable that the parties share these litigation expenses equally.
The court issues the following orders:
1. The marriage of the parties is dissolved.
2. The parties shall have joint legal custody of the minor children with primary residence being with the defendant wife, subject to the CT Page 2022 parenting schedule set forth below. Major decisions affecting the children's health, education, religious upbringing, and social development shall be considered and discussed between the parties in an attempt to reach agreement. If agreement can not be reached, the defendant wife shall be entitled to make the final decision.
3. The plaintiff father shall have parenting time with the minor children on alternating weekends from Saturday at 9:30 a.m. to Sunday at 6:30 p.m. The father shall pick the children up on Saturday mornings and the mother shall pick them up at the father's residence on Sunday evenings. Both parents are responsible for all transportation to extra activities while the children are in their care. The mother shall inform the father of all activities of the children so as to allow non-interruptive transportation for the children and appropriate participation by the father. Additionally, father shall be allowed to take Jeremy on one Friday per month and Daniel one Friday per month, not the same Friday, and preceding his weekend. Father shall pick the son up from school and shall have him overnight. The goal of this is to allow father and son to work on their individual relationship and allow father to pass religious traditions down to his sons. Additionally, father shall work with his counselor, see below, who may wish to consult with Jennifer's counselor so as to attempt to strengthen and repair father's relationship with his daughter so that in the future, father may spend additional time with her.
Further, both parents are proud of, support and encourage their children's Jewish heritage. Towards that end, father shall assist mother in the transportation and facilitation of the children's religious training, including preparation for Bar Mitzvah, etc. The parents shall also work with their parent counselor to make the children's celebration an important and meaningful event in the children's lives.
The father shall also have one mid-week visitation with the children on Wednesday from 4:30 p.m. to 7:30 p.m. If, however, such visit falls when any of the children have counseling or activities, the father shall transport the child/children to and from such counseling or activities and participate appropriately. The father shall ensure that the children's homework is completed and meals provided. Father shall have the children home by the designated hour. The parties shall work with the parenting counselor to deal with issues of pick up drop off and the timeliness of the same, as well as completion of homework, etc.
Both parties shall notify the other of their whereabouts including telephone number when the children are in their care.
The parents shall split the school vacation weeks. For the February and CT Page 2023 Spring vacation weeks, the parents whose weekend visitation precedes the week off shall have the children until 6:30 p.m. on Wednesday and the other parent shall have the remainder of the week and their regular weekend. For the Christmas vacation, the parents shall split the week and maintain the regular alternating weekend visitation. Jewish holiday schedules shall supercede these weeks' schedules.
The parents shall alternate Thanksgiving Day and the Friday after Thanksgiving and shall maintain the alternating weekend visitation for that Saturday and Sunday. Thanksgiving Day and that Friday visitation, if with father, shall be from 10:00 a.m. to 7:00 p.m.
The parents shall alternate the Jewish holidays as follows:
a. Purim — mother in odd years, father in even;
b. Passover — Day 1 — father in odd years, mother in even'
c. Passover — Day 2 — mother in odd years, father in even;
d. Simchat Torah — father in odd years, mother in even;
e. Rosh Hashanah — Day 1 — mother in odd years, father in even;
f. Rosh Hashanah — Day 2 — father in odd years, mother in even;
g. Yom Kippur — mother in odd years, father in even;
h. Succoth — father in odd years, mother in even;
i. Chanukah — Days 1-4 — mother in odd years, father in even; and
j. Chanukah — Days 5-8 — father in odd years, mother in even.
The parents shall alternate the following holidays:
a. Memorial Day — mother in odd years, father in even;
b. July 4th — father in odd years, mother in even;
c. Labor Day — mother in odd years, father in even;
d. Columbus Day — father in odd years, mother in even; and CT Page 2024
e. Veterans' Day — mother in odd years, father in even.
Should any of these particular days immediately precede or follow a regular weekend visitation, the children shall stay overnight with that parent for the holiday day. Holidays and vacations shall supercede regular visitation schedules.
Father shall have Father's Day and mother shall have Mother's Day. Should either of these days fall on the other parent's regular weekend, the visitation shall be from 10:00 a.m. to 6:30 p.m.
Each parent shall have two non-consecutive summer vacation weeks with the children each year, one in July and one in August. The father shall choose his July week first in odd years, mother first in even and mother shall choose her August week first in odd years and father in even. Each parent shall notify the other of their choice of weeks by May 15th of each year so as to allow appropriate summer day care and/or camp and activity plans to be scheduled. Should any of the children participate in events, i.e., sports or gymnastics, each parent shall take serious notice and give consideration to allowing the child/children to complete their season participation, even if it requires adjustment to the July/August scheduling. Each parent must acknowledge and appreciate the necessity to allow the children to fully and actively participate and shall be responsible for completion of their obligation to complete their participation and contribution to these summer team activities.
4. The parties shall immediately enroll in the P.E.A.C.E. Program, the high conflict clinic at Beacon Behavioral, or similar program selected by Drs. Zimmerman and Horowitz, for a minimum of fifteen (15) sessions. This order is the only one which was agreed to by the parties. The parties shall follow the recommendations of the program's director so as to improve the parties parenting, communication and lives of their children. The parties shall undertake any reasonable request made of them by the program's director including bringing in third party, including significant others, other children, etc., to any sessions. The parties shall also undertake additional counseling for themselves. The program's director and Dr. Sidney Horowitz, the court appointed evaluator, shall select the counselor. The parties shall be required to engage in individual counseling so that they can appreciate how their own behaviors have negatively impacted their children, how they can better deal with the other parent and the children and to alleviate any fears or anxiety they are having in dealing with one another. The parties shall write a letter to the other's therapist outlining any issues that they feel need to be addressed by the therapy. Plaintiff shall write a letter to Defendant's therapist indicating his concerns about both mother and CT Page 2025 children. Defendant shall write a letter to Plaintiff's therapist indicating concerns about father and children. The attorney for the minor child, in conjunction with the Guardian ad Litem shall be given the letters and shall transmit them, together with a letter they have jointly written to both therapists outlining concerns about all family members. The Attorney for the Minor Children and Guardian ad Litem shall include a copy of any evaluation done to aid the court in this case including that done by Dr. Sidney Horowitz.
5. Each parent shall have reasonable, unfettered telephone, electronic and mail contact with the children while they are with the other parent, respecting at all times the children's desires, needs, homework, counseling and extra-curricular activities, schedules and demands. Neither parent shall discourage, dissuade or otherwise influence the children from contacting the other parent should the children desire to do so. Except in the case of an emergency, neither parent shall contact the children after 8:00 p.m. on school nights, or 9:00 p.m. at other times. Each parent shall notify the other of the destination and a telephone number with which each may reach the children whenever the children are away from their respective residences during the vacation times. Neither parent shall interfere or disrupt the other's vacation time wit the children, but shall be notified of their whereabouts. Neither parent shall use the children as messengers or deliverers of information or paperwork other than that of sharing school work and activities and extra-curricular schedules. Neither parent shall discuss any "adult" issues with the children, i.e., court matters, legal matters concerning the dissolution and/or visitation, or financial issues.
6. The plaintiff father shall pay the defendant mother child support in accordance with the Guidelines without deviation. Child support shall be based upon a gross weekly income of $1,639 for the plaintiff, and $707 for the defendant. Within 10 days the parties are ordered to attempt to produce a joint child support guidelines worksheet for submission to the court so that the amount of the weekly child support can be set. If the parties are unable to agree upon a joint worksheet, they are ordered to submit individual worksheets. In this event, the court will consider whether additional testimony is necessary to resolve the differences in the worksheets. If this is required, the court will give serious consideration to the award of counsel fees if either party is found to have advocated a frivolous position. Child support shall be paid by immediate wage withholding and shall continue until each child attains the age of 18 years, but if still in high school, support shall continue through high school graduation but not beyond the age of 19 years. The plaintiff shall also pay as additional support 50% of all unreimbursed medical, dental (including orthodontic), psychiatric/psychological, and optical expenses. This percentage shall be calculated only after the CT Page 2026 defendant has expended $100 per year per child of unreimbursed medical expenses. The plaintiff father shall also pay to the defendant as additional support 50% of reasonable day care/summer camp provided it is necessary for the defendant to maintain employment. The parties are ordered to give notice to each other of any changes in their employment or income within ten days of the change.
7. The defendant mother shall maintain medical insurance for the children for so long as available through her employment. One-half of any premium cost to the defendant to maintain this coverage shall be paid by the plaintiff to the defendant as additional child support each week. If insurance is no longer available to the defendant from her place of employment at a reasonable cost, the plaintiff shall be solely responsible for obtaining and maintaining medical and dental insurance.
8. The plaintiff husband shall pay periodic alimony to the defendant wife in the amount of $200 per week until the death of either party, the remarriage of the defendant, or 8 years from the date of this judgment, whichever shall sooner occur.
9. All 401k accounts, IRA accounts, deferred compensation accounts, or any other form of retirement account shall be totaled and equalized between the parties. This equalization shall be accomplished by assignment and/or Qualified Domestic Relations Orders as required by the plan administrators. The plaintiff husband shall be responsible for the cost and preparation of all necessary paperwork to ensure this equalization. The court will retain jurisdiction until this equalization has been accomplished. The parties shall retain their respective pensions.
10. Within 30 days the plaintiff shall convey to the defendant by quit claim deed all of his right, title, and interest in the marital home at 106 Patriot Road, Southbury, Connecticut. The defendant shall pay the mortgages on the property and shall indemnify and hold the defendant harmless from liability for these obligations.
11. The stocks, bonds, and mutual funds shall be divided so that the defendant receives $58,074 in value. This sum includes the amounts set forth in paragraphs 15, 16, 17, 18 and 19 of the financial findings. The balance of these assets shall be retained by the plaintiff. If the parties are unable to reach agreement regarding the division of these assets, they are ordered to mediate their differences with Family Services before bringing their dispute to court.
12. The defendant shall retain the 1998 Plymouth automobile currently in her possession, free and clear of any claim of the plaintiff. The CT Page 2027 plaintiff shall retain the 1992 Honda automobile currently in his possession, free and clear of any claim of the defendant.
13. The plaintiff shall be entitled to ownership and possession of the piano in the marital home and all personal property in his possession. With the exception of the piano, the defendant shall retain all personal property in her possession.
14. The parties shall each retain their own bank and credit union accounts.
15. The plaintiff shall maintain a life insurance policy in the amount of $300,000 with the defendant and minor children as irrevocable beneficiaries for so long as his financial obligation to the defendant and the children exists. This policy is available and affordable.
16. The plaintiff shall be entitled to take the dependency exemption for the minor children Jeremy and Jennifer provided that he is entitled to do so as a matter of Federal law and provided that he is current in his child support payments on December 31 of the year for which the exemptions are sought. The defendant shall be entitled to take the dependency exemption for the minor child Daniel provided she is entitled to do so as a matter of Federal law.
17. All accounts held in trust for the minor children shall remain as they are presently held. The plaintiff shall notify the defendant at least 30 days in advance of his voluntary or involuntary change in status as trustee of The Schain Family Irrevocable Trust and The Schain Grandchildren Trust. Both parents shall ensure that any change in the trustee(s) or terms of these trusts in no way adversely affects the benefits currently afforded the children as beneficiaries of these trusts. All custodial accounts held for the benefit of the children shall remain in tact. Each parent shall notify the other at least 30 days prior to any change or disbursement of such accounts. Each parent shall send copies of any and all statements of such accounts as they are received to the other parent.
18. Beginning with the year 2001 forward, the parties shall each pay 50% of the cost of synagogue membership, religious school expenses, and all other costs of the religious education and training of their children.
19. The total bills of the Guardian Ad Litem, Attorney Margaret Hollon, the attorney for the minor children, Attorney Barry Armata, and the psychological evaluator, Sidney Horowitz, shall be paid equally by the parties. The parties shall be given credit for their previous CT Page 2028 payments and shall pay their respective outstanding balances within 60 days from the date of judgment.
John W. Pickard, J.